CHURCH *v.* ANTI-KALSOMINE CO.

1. ACTIONS—TORTS—CONTRACT AS BASIS.

The fact that a cause of action arises because of contract relations between the parties does not necessarily preclude the action's being framed in tort, where a considerable part of the case rests upon matters outside of, though connected with and dependent upon, the contract.

2. SAME—EQUITY JURISDICTION—FIDUCIARY RELATIONS.

A declaration set forth a contract under the terms of which defendant, a corporation, agreed to purchase and protect certain patents in which plaintiff was interested; to continue plaintiff in its employ at a stated salary; and to divide with him annually the net profits of the business in excess of a specified sum. Damages were asked for the wrongful and fraudulent destruction of profits which should have accrued to plaintiff under the contract. There was no allegation that defendant had in its hands profits, money, or property in which plaintiff was entitled to share. *Held*, on demurrer, that no such fiduciary relations were shown as to give equity exclusive jurisdiction.

3. SAME—LEGAL REMEDY—ACCOUNTING.

A court of law may take jurisdiction of an action to recover unliquidated damages for a fraudulent breach of contract, although the declaration shows that an extensive, though not complicated, account must be taken in the case.

4. SAME—COMPULSORY REFERENCE—AUDITORS OF ACCOUNT.

An objection that the remedy at law is impracticable in such a case, because of the inability of a jury to retain the items of the account, is without force, in view of 2 How. Stat. § 7378, authorizing a compulsory reference of matters of account in actions at law where no jury is demanded, and 2 How. Stat. §§ 7386, 7391, authorizing the appointment of auditors, when a case is at issue, to investigate such accounts, and making the report of the auditors competent evidence.[1]

---

[1] The effect of a compulsory reference as a denial of the right to a jury trial is the subject of a note to *Steck* v. *Colorado Fuel & Iron Co.*, (N. Y.) 25 L. R. A. 67.

Error to Kent; Adsit, J.  Submitted June 14, 1898. Decided September 27, 1898.

Case by Melvin B. Church against the Anti-Kalsomine Company for fraudulently destroying profits of the corporation which should have accrued to plaintiff.  From a judgment for defendant on demurrer to the declaration, plaintiff brings error.  Reversed.

The following is a copy of the declaration:

"(1) Melvin B. Church, plaintiff herein, by Uhl, Hyde & Earle, his attorneys, complains of the Anti-Kalsomine Company, a corporation, defendant herein, of a plea of trespass on the case, the said defendant having been heretofore summoned to answer the said plaintiff herein.

"(2) For that whereas, the said defendant is a corporation organized and doing business under the laws of Michigan, and having its principal place of business in the county of Kent aforesaid.

"(3) For that whereas, the said plaintiff heretofore, to wit, from about the year A. D. 1875, has been engaged in the perfection, preparation, manufacture, and sale of wall coatings, and has made from the time aforesaid hitherto many inventions, discoveries, and improvements in the art of wall coatings, the machinery for the manufacture of the same, and methods for using, advertising, and selling the same, and that the name of said plaintiff has become closely identified in the minds of the public, in the United States and other countries, with the said business, and that the name of said plaintiff constituted a large part of the value and the good will in trade of the said defendant hereinafter mentioned.

"(4) For that whereas, the said plaintiff, in the year 1875, invented and discovered a compound to be used in wall coatings aforesaid, composed of calcined plaster and glue, which had had, prior to the year 1892, a large sale in the United States and other countries, and the manufacture and sale of which was very profitable to the said plaintiff, and to those connected with him in the manufacture and sale thereof, and that letters patent had been issued to the said plaintiff for the invention so made, by the United States, which letters patent were numbered 161,591, and dated the 6th day of April, 1875, and, under

the laws of the United States, would expire on the 6th day of April, 1892; and said plaintiff also obtained letters patent from the United States for an improvement made by him in the said wall-coating compound, dated April 4, 1882, and also obtained other patents relating to the business of manufacturing and producing wall-coating compound, as follows: Letters patent dated April 4, 1882,—one for a process of exterior painting, in which the wall-coating compound was used,—and also two letters patent obtained from the United States on the 13th day of June, A. D. 1882, consisting of improvements in grinding machinery for making said wall coating,—which letters patent were of great value to the said defendant, and became the property of the said defendant on, to wit, the day of its organization, and were used by it in its business; and on the 1st day of October, A. D. 1891, the said defendant was the sole owner of the said letters patent, and the sole user thereof, with the exception as hereinafter stated.

"That on or about the 1st day of February, 1885, the defendant corporation was organized for the purpose of manufacturing and selling in the United States the compound aforesaid, and other compounds of like nature, composed mainly of plaster and glue; that the said corporation assumed and took over the business of the said plaintiff and others engaged therein with him, and said defendant, on or about the 17th day of June, 1886, became the purchaser and owner of the entire capital stock of a corporation known as the 'Alabastine Company,' organized under the laws of the State of New York; that from the organization of defendant company, and during all the time aforesaid, until the 1st of October, A. D. 1897, said plaintiff was the manager and director of the said business so carried on by the said defendant, and was a stockholder in said defendant; that prior to the 27th day of January, A. D. 1892, the business of the said defendant had become of great value and very profitable to it, and to the said plaintiff as a stockholder therein; that the total amount of capital paid into the said corporation, aside from its earnings, was the sum of, to wit, $25,000, and that on or about the 19th day of October, A. D. 1892, the capital stock of said company was increased to the sum of $400,000, and that the increase of the property of the said defendant from the sum of $25,000 to the sum of $400,000 was solely caused by the increase of the good will

and business of the said defendant under the management of the said plaintiff, and the increase in value of the inventions and discoveries aforesaid of the said plaintiff.

"(5) For that whereas, the business of manufacturing wall coatings, composed mainly of calcined plaster, was originally discovered and invented by the said plaintiff, and was carried on and manufactured by him, prior to the organization of the said defendant, in the year 1885, from the year 1880, the date of organization of the said Alabastine Company, and was exceedingly profitable, and paid yearly net profits averaging more than $50,000 per year, and that the investment prior and up to the year 1886, exclusive of the earnings of the said business, was about the sum of $25,000, all of which investment had, prior to the year 1886, been repaid to the investors, and that the said sum of more than $50,000 per annum was made in that part of the United States west of the State of New York, exclusive of the Pacific coast and some points on the coast of the Gulf of Mexico.

"(6) For that whereas, from and including the season of 1886 to the 1st day of October, A. D. 1891, the net earnings and profits of the business of the said defendant aforesaid were the sum of, to wit, $311,293.43.

"(6½) For that whereas, from and including the year 1886 to the 1st day of October, 1891, competition with the said defendant in the business aforesaid had gradually disappeared as far as the manufacture of wall coatings composed mainly of calcined plaster was concerned, and on, to wit, the 1st day of October, 1891, the said defendant was practically without competition in the business aforesaid in the United States.

"(7) For that whereas, the business of manufacturing, advertising, and selling wall coatings, from the time the said plaintiff engaged in said business to the 1st day of October, 1891, so carried on as aforesaid, was under the exclusive management of the said plaintiff, and that the success of the said business was due to the efforts of the said plaintiff; that the said plaintiff was constantly devising means to improve the products aforesaid, the methods of making, advertising, and selling the same, and became and was on the 1st day of October, A. D. 1891, and has ever since continued, very skillful therein, and his services to the said defendant have always been of great value.

"(8) For that whereas, in the year 1891, one Robert E.

Haire, then in England, made a discovery which resulted in producing the said compound of calcined plaster and glue in form adapted for use by adding cold water, and that the invention of the said Haire also included the use of other materials as a base with glue in dry form, such as whiting, chalk, dry colors, etc.; that the said Haire also discovered a process for producing the same; and that the said plaintiff also invented, during the year A. D. 1891, while in England, a process for producing the same result, based on the discovery aforesaid of the said Haire, for producing the same compound, but different from the process aforesaid of the said Haire; that the discoveries and inventions of the said plaintiff and the said Haire were of great value, for the reason that prior thereto all dry preparations for producing adhesive wall coatings, and containing animal glue as an adhesive, composed of plaster, whiting, dry colors, or any such dry base, had required hot water to prepare them for application to walls and like surfaces with the brush; that the value of the said discoveries and inventions for use in the United States and Mexico, properly managed, was at least the sum of $1,000,000; that the said discoveries and inventions were and are generic,—the first of the kind to be made; and that letters patent covering the discovery and invention of the said Robert E. Haire were issued by the United States on the 5th day of June, A. D. 1894, numbered 521,143, the said Haire's discovery being that a dry compound could be produced mechanically, composed of animal glue and a base, in such a finely-divided condition as to be available for wall coating without the use of heat or chemicals for dissolving the glue; and that letters patent based upon the discovery aforesaid of the said Haire were issued by the United States to the said plaintiff on the 16th day of January, A. D. 1894, numbered 513,203, covering the other method referred to above of producing the compound in the condition described by said Haire.

"(9) And for that whereas, the said plaintiff, on the 1st day of October, A. D. 1891, by virtue of an agreement with the said Robert E. Haire, controlled the said discoveries of the said Haire for all countries; that the said agreement provided for the payment by the said plaintiff to the said Haire of a royalty for the use of the same.

"(10) For that whereas, the said plaintiff, while in the control and management of the business aforesaid, and

about the year A. D. 1884, and prior to the organization
of the said defendant, as manager of the Alabastine Company aforesaid, purchased plaster lands adjoining the city
of Grand Rapids, in said county, and erected a plaster
mill thereon, for the purpose of supplying the Alabastine
Company aforesaid with calcined plaster of a superior
quality for its business of manufacturing wall coatings
aforesaid; and that the said plaster mill and lands became
the property of the said defendant at the time of the purchase of the Alabastine Company aforesaid, and has so
remained from thence hitherto; and from the time of such
purchase until the 1st day of October, 1891, the said
defendant carried on the manufacture of calcined plaster
and land plaster in said mill, and, after supplying itself
with calcined plaster needed for the manufacture of wall
coatings and other products manufactured by the said
defendant, sold the surplus product to others; and that
that part of the business of said mill which consisted in
the manufacture of plaster for sale to others constituted
and was and is called the 'plaster business' of said defendant, and the term 'plaster business,' referred to in the
contract hereinafter mentioned, was understood by the
said plaintiff and the said defendant, on the 1st day of
October, A. D. 1891, to mean the plaster business as carried on by other mills in said county.

"(11) And for that whereas, the said plaintiff and the
said defendant, on, to wit, the 27th day of January, A.
D. 1892, to wit, October 1, 1891, at, to wit, the city of Grand
Rapids, in said county, made and entered into an agreement in writing, hereinafter set forth, and at the time the
contract aforesaid was entered into with the said defendant so owning and controlling the discoveries and inventions of the said Haire and said plaintiff in relation to the
compound aforesaid, composed of calcined gypsum and
glue and other kinds of base, and the processes for its production in such form that it could be used by the addition
of cold water as aforesaid, entered into the contract aforesaid, by the terms of which the said defendant was to
have assigned to it the letters patent for said compound
and processes when granted, covering the United States
and Mexico, with the distinct understanding between
the said plaintiff and the said defendant that one of the
chief purposes the said plaintiff had in view in making
said contract was that the said defendant, under management of the said plaintiff during the life of said con-

tract, might establish and demonstrate the great value of the said discoveries and inventions in countries besides the United States and Mexico, for the purpose of establishing the business of manufacturing and selling wall coatings made according to the said inventions and discoveries, from which he informed the said defendant he confidently expected to receive great profits from the sale of the said discoveries and inventions and the carrying on of the business aforesaid; and that the said defendant well understood that it was important to the interests of the said plaintiff and the said defendant that the validity, utility, and value of the said letters patent so granted by the United States should be carefully protected and vindicated, not only in the United States, but wherever the same might be used.

" (12) And for that whereas, the said plaintiff, to wit, before October 1, A. D. 1891, had established a factory for the manufacture of wall coatings at the city of Paris, in the Dominion of Canada, and at the time aforesaid had also established a factory for the manufacture of wall coatings aforesaid at the city of London, England, in which factories wall coatings were manufactured according to the discovery and processes aforesaid made by the said plaintiff and the said Haire; and that on, to wit, the 1st day of October, A. D. 1891, the said plaintiff had established a foreign trade in the wall coatings aforesaid in many foreign countries, to wit, at the city of Cape Town and other points in South Africa, Melbourne and Sidney, in Australia, and other points in Australia, and in Bombay and other points in India, and numerous points in the Dominion of Canada, Great Britain, and Ireland, and other foreign countries, and that the said plaintiff, to wit, July 1, 1891, and thereafter, had purchased from the said defendant wall coatings aforesaid, to be shipped to foreign countries, and which the said defendant had shipped to foreign countries as directed by the said plaintiff, and the said plaintiff had realized large gains and profits from the foreign business aforesaid, and had introduced the goods aforesaid, and the prospect for the said foreign trade was good, and plaintiff confidently expected, to wit, October 1, 1891, to make large gains and profits out of the foreign business aforesaid, as the said defendant was then informed by the said plaintiff, to wit, at the county of Kent, aforesaid.

"(13) And for that whereas, at the time of entering into the contract hereinafter mentioned, the said plaintiff informed the said defendant that he intended, among other things, to erect a plant for the manufacture of glue for the use of the said defendant in its business aforesaid, and thereby save to the said defendant large expense, and thereby increase the profits to the said defendant and the said plaintiff under the said contract.

"(14) And for that whereas, on, to wit, the 1st day of October, A. D. 1891, at the time of entering into the contract hereinafter mentioned, the plaintiff insisted that he should have more complete management of the business of said defendant than he had had theretofore, as hereinbefore stated; and that the said defendant then and there consented that the said plaintiff should become more completely the manager, with enlarged power, of its business, and that he should be elected the president of the Alabastine Company aforesaid; and that said plaintiff was accordingly elected president thereof, for the purpose of giving him the proper standing and influence in the trade in this and foreign countries.

"(15) And for that whereas, the said plaintiff and the said defendant, on, to wit, the 27th day of January, A. D. 1892, at, to wit, the city of Grand Rapids, in said county, made and entered into an agreement in writing, in the words and figures following, to wit:

" 'An agreement, made this 27th day of January, 1892, between the Anti-Kalsomine Company, a corporation organized under the laws of the State of Michigan, with headquarters at Grand Rapids, in said State, of the first part, and Melvin B. Church, of Grand Rapids, in the State aforesaid, of the second part, witnesseth as follows :

" 'The first party hereto is now, and for some years last past has been, engaged in the manufacture and sale of certain products for wall finish and wall coating, also for the filling of wood, and for other purposes, the base of which product is calcined gypsum. The° first party manufactures and sells these goods in its own name, and also in the name of the Alabastine Company, a corporation of the State of New York, the entire capital stock of which belongs to the first party hereto. The second party has been connected with the first party hereto from the outset of its organization, both as a stockholder and as its manager.

" 'It is claimed by the second party that one Haire, now living in England, has made a new improvement and discovery in wall coating, by means of which the product may be manufactured with

calcined gypsum, or other suitable product, as a basis, and may be used and applied with a brush after mixing the same with cold water. In the use of the product heretofore, hot water has been necessary to prepare the article, and an improved article, which may be applied with cold water, would be superior, it is claimed, to anything now in use or heretofore known, and the ownership of such discovery and invention by the first party, it is also claimed, will result in increased gains and profits. For the purpose of this contract, it is assumed that the net profits of the first party, from all business during the fiscal year ending October, 1891, from all sources other than its "plaster business" (so called), was $40,000. The second party hereto claims that these profits can be greatly increased in the future by the introduction of the goods made according to the improved plan referred to, and he has proposed, in consideration of what follows herein, to make the first party the owner, within certain territory, of the invention and improvements in question. In addition to the invention and discovery of the said Haire, the second party also claims to have discovered and invented certain improvements, by which the same result may be produced as above outlined, but by other methods, claimed to be novel. It is also claimed by the second party that the discovery and invention of the said Haire, and also his own improvement, are severally patentable. The stockholders of the first party have duly considered the plan, and have ratified the bargain now made.

"It is therefore agreed between the parties hereto as follows:

" *'First.* The second party shall continue in the service of the company for the five fiscal years of the first party, including the present one, at an annual salary of $5,000. During the period last stated, the second party will under no circumstances or conditions engage, directly or indirectly, in any business which will be in competition with that of the first party hereto, nor be in any wise concerned in any competing business.

" *'Second.* The second party will cause and procure to be transferred to the first party the invention and discoveries of the said Haire in the direction above referred to; will also procure from the said Haire an agreement and undertaking by which he shall agree that all inventions and improvements which he shall make in the future, in the direction of wall finish or wall coating of any kind, shall belong exclusively to the first party, within the territory of the United States and Mexico; and that, whenever the said Haire shall be requested, he will make and sign such papers as may be necessary to assure to the first party the ownership of such discoveries and inventions, and will also, on request, sign such applications for patents as the first party shall deem necessary. The second party will also procure an application to be made by the said Haire for a

patent within the United States on the inventions and discoveries already made.

"'*Third.* The second party will also, as requested, make such applications as may be necessary for the issuance of a patent or patents within the United States, covering any invention or improvement made by him in the direction in question, and will also make like applications in the future, when requested, for any further improvements. All patents which may be issued to the said Haire, or to the second party, shall belong and be assigned to the first party hereto: *Provided,* however, that the expenses attending the obtaining of such patents shall be paid by the first party to this agreement.

"'*Fourth.* The net profits of the first party arising from all business done by it, other than the plaster business, as the same shall be at the end of each fiscal year, in excess of $40,000, shall be divided equally between the parties to this agreement, and such division shall continue from year to year during the entire term of five years.

"'*Fifth.* At some time during the five years, the capital stock of the first party shall be increased to $400,000, being an amount upon which the net earnings of $40,000 referred to will pay 10 per cent. dividend. ·

"'*Sixth.* At the end of the said period of five years, the net profits, above the fixed sum of $40,000, during the whole period in question, shall be added together and divided by five, to obtain the annual increase of profits. The average amount so found shall then and there be capitalized on a like 10 per cent. basis, and one-half of the stock so issued shall be given to the second party as his own, and the remaining one-half shall belong to the stockholders of the first party, according to their respective holdings.

"'*Note:* In case there shall be an increase of the profits during the period in question, as expected by the parties to the agreement, the capital stock of this company, after the end of the five years, will be $400,000, being the present earnings capitalized at 10 per cent., together with the average annual increase of earnings over the said sum of $40,000, also capitalized on the same basis.

"'*Seventh.* The second party will give his best endeavors and attention to the business. He is to be at liberty, however, to give a certain general supervision to a like business abroad, in which he is interested, but not to such an extent as to interfere with or neglect the business of the first party hereto. In case the second party shall be absent from active attention to the business of the first party for a greater period than 60 days in any one year, he shall receive no salary for such greater period.

"'*Eighth.* It is agreed between the parties that the first party

will not manufacture or sell its goods outside the United States, except Mexico; and second party will not allow any goods of a like kind, or for a like purpose, in which he is interested, or in so far as he can control the same, to be manufactured or sold within the United States or Mexico.

" ' *Ninth.* The rights herein provided for the second party shall accrue to, and be for the benefit of, his heirs, executors, administrators, and assigns, as executed and delivered.

" 'THE ANTI-KALSOMINE COMPANY,

" 'By A. J. BOWNE, President,

" ' A. D. RATHBONE, Secretary.

" ' MELVIN B. CHURCH.'

"That the said contract, by the terms thereof, became operative and took effect on the 1st day of October, A. D. 1891.

"(16) And for that whereas, the said plaintiff, on the 1st day of October, A. D. 1891, by virtue of said contract, and according to the terms thereof, entered upon the management and conduct of the business of the said defendant, and fulfilled the said contract in all respects on his part as provided therein; that he procured letters patent to himself and to the said Robert E. Haire, as provided in said contract and as heretofore stated, and assigned the same to the said defendant.

"(17) For that whereas, the said defendant, on, to wit, the 1st day of February, A. D. 1892, refused to carry out the provisions of the said contract by it to be performed, and refused to permit the said plaintiff to manufacture and sell wall coatings under said letters patent last named, and delayed the introduction of the cold-water goods referred to in said contract, and for that reason, and in consideration thereof, on, to wit, the 30th day of September, 1892, by resolution, entered into an agreement with the said plaintiff extending the period of the contract above set forth one year.

"(18) And for that whereas, the said defendant, on, to wit, the 1st day of October, A. D. 1891, and from thence during all the time until the 1st day of October, A. D. 1897, in violation of said contract, fraudulently carried on, maintained, and encouraged the business of manufacturing wall coatings in opposition to the business of the said defendant, heretofore described and referred to in said contract, by means of a separate organization known as the 'Diamond Wall-Finish Company,' and fraudulently employed, as its secretary, A. D. Rathbone, the president of

said company known as the 'Diamond Wall-Finish Company,' and fraudulently employed in its office the said A. D. Rathbone, president thereof, and also J. L. Hamilton, the vice-president thereof, who assumed, with the consent of said defendant, to interfere with plaintiff's management of said business, and fraudulently manipulated defendant's business, and discouraged its customers, by unfair and arbitrary treatment, in the interest of said Diamond Wall-Finish Company; and that the said Diamond Wall-Finish Company, so carried on, maintained, and encouraged by the said defendant, fraudulently availing itself of the knowledge obtained through the secretary and assistant aforesaid of the said defendant, of the business methods and correspondence of said defendant, from the 1st day of October, A. D. 1891, was the principal competitor of the said defendant in the business of manufacturing wall coatings; and that the said defendant fraudulently maintained the said Diamond Wall-Finish Company, and its mill and machinery, for the manufacture of wall coatings as aforesaid, and fraudulently employed numerous workmen in the manufacture thereof, and large numbers of traveling salesmen for the sale thereof, and fraudulently instructed the salesmen aforesaid to obtain the customers of the said defendant, and destroy its trade and good will, and undermine its business; and that, in pursuance of such instructions, the Diamond Wall-Finish Company, so maintained, carried on, and encouraged, entered into competition with the said defendant, and undersold said defendant, and prevented large sales of its goods aforesaid, and destroyed the profits of the said defendant thereon, and decried the merits of the goods of the said defendant, and fraudulently and falsely pretended that the goods of the said Diamond Wall-Finish Company were superior to the goods of the said defendant; and that said Diamond Wall-Finish Company infringed the letters patent so granted to the said plaintiff and the said Robert E. Haire, and other patents belonging to the said defendant; and that the said president and vice-president of the said Diamond Wall-Finish Company, during all the time last aforesaid, were actively engaged in so fraudulently obstructing and destroying the business of the said defendant, and betraying its business methods and secrets to the said Diamond Wall-Finish Company, while receiving large salaries from the said defendant, and while they were in duty bound to devote their whole time

and attention to the successful prosecution of the business of the said defendant, aside from the said fraudulent business of the said Diamond Wall-Finish Company; and that under the like fraudulent instructions of the said defendant, its secretary and assistant aforesaid, the salesmen of the said Diamond Wall-Finish Company fraudulently claimed and pretended that the said Diamond Wall-Finish Company and the said defendant were practically one, and that the said plaintiff was the manager of the business of the said Diamond Wall-Finish Company as well as of the business of the said defendant, and fraudulently claimed and pretended that the letters patent for cold-water goods so issued to the said plaintiff and the said Robert E. Haire, as aforesaid, were invalid and worthless; and that the said defendant fraudulently claimed and pretended to the said plaintiff that the plaster business aforesaid, referred to in said contract, from the 1st day of October, A. D. 1891, to the 1st day of October, A. D. 1897, had been very profitable; and that the said defendant fraudulently credited to the said plaster business large sums of money earned by the said defendant in its business other than the said plaster business, and fraudulently credited said plaster business large sums for plaster used by defendant more than it used in its business aside from the plaster business, and fraudulently credited said plaster business more than the going price per ton for calcined plaster used by defendant in its business other than the plaster business, and fraudulently and secretly increased the expenses of the said defendant and the salaries of its servants, and fraudulently and secretly employed unnecessary servants and agents in its said business, and wastefully conducted its said business, and permitted the said Diamond Wall-Finish Company to consume its property and moneys without payment, and fraudulently paid out of its funds large sums of money, to wit, $5,000, for the benefit of said A. D. Rathbone, president, and J. L. Hamilton, vice-president, of said Diamond Wall-Finish Company, without compensation or consideration, and fraudulently expended large sums of money, to wit, $40,000, in the maintenance of the said Diamond Wall-Finish Company as its competitor; and that said defendant directed and permitted the said Rathbone and Hamilton to use the knowledge obtained by them while in the employ and pay of defendant, of the plans of defendant, to forestall such plans for the benefit of said Diamond Wall-Finish Company.

" (19) And the said plaintiff further avers that, in pursuance of his duty as manager of the business of said defendant under said contract, he maintained and carried to a successful issue important interference suits in the patent office of the United States, in the matters of the applications of the said plaintiff and the said Robert E. Haire for the inventions aforesaid, and for the establishment of the title and validity of the said letters patent; and that the said plaintiff also instituted and carried to a successful issue, during the life of said contract, an important suit in equity, brought by him and the said Robert E. Haire, as complainants, in the high court of justice in England, to establish the ownership of the said letters patent; and that the said plaintiff also, during the life of said contract, began a second suit in the high court of justice in England, for the further protection of the title and validity to said letters patent, which said second suit involved the right of the said plaintiff and the said Robert E. Haire, and their assigns, to control the manufacture of a compound for wall coatings that could be used with cold water only, as above described, containing other bases than calcine plaster in combination with glue as aforesaid, and that the said second suit is now pending and undetermined in the English courts; and that the said plaintiff maintained and carried on the litigation aforesaid at great expense of time and money, and that the said defendant, although often requested so to do, has neglected and refused to repay him for the moneys so expended as aforesaid, to wit, the sum of $5,000.   That, at about the time that the said plaintiff began the first suit in England above mentioned, the Muralo Company, a corporation organized under the laws of the State of New York, began suit against the said defendant in the circuit court of the United States for the Western district of Michigan, claiming that it was guilty of an infringement of letters patent known as the King patent; that the said Muralo Company and the said defendant in the suits brought by plaintiff as aforesaid, in England, were interested in both cases, and it was well understood that the determination of the case brought by the said Muralo Company, or the first suit brought by the plaintiff in England as aforesaid, would determine both suits; and that, after said plaintiff had prosecuted the said suit so brought by him in England to a successful issue, the said Muralo Company dropped its case against the defendant; and that the said plaintiff,

by the litigation in England aforesaid, established the title and validity of the cold-water patents, so assigned to the said defendant, issued by the United States.

"(20) And the said plaintiff further avers that the said defendant, although often requested so to do, has refused and still refuses to pay to the said plaintiff the salary stipulated and agreed upon in the contract aforesaid, to wit, the sum of $10,000.

"(21) And the said plaintiff further avers that, in pursuance of the fraudulent scheme of the said defendant to defeat him in realizing any profit upon the said contract, and to prevent him from receiving any payment whatever for the letters patent so assigned to the said defendant, and to prevent him from establishing the value of said discovery and inventions, and to destroy the foreign business of the said plaintiff, fraudulently and secretly obstructed and embarrassed the said plaintiff in the management of the business of said defendant under said contract, and in the introduction of the said cold-water goods, and instructed the workmen, servants, and agents employed by the said defendant not to carry out the instructions of the said plaintiff in the management of said business which he might lawfully give under the said contract, and permitted the said Diamond Wall-Finish Company to secretly employ the skilled servants of defendant in its business, and secretly instructed defendant's salesmen to sell the goods of the said Diamond Wall-Finish Company, and practically deposed the said plaintiff as manager of the business of said defendant, and allowed the said president and vice-president of the said Diamond Wall-Finish Company to conduct and manage the business of said defendant in the interest of the said Diamond Wall-Finish Company, and fraudulently and falsely claimed and pretended, to wit, from the 1st day of October, A. D. 1891, hitherto, that the said defendant has not realized more than a net profit of $40,000 a year from its business other than the said plaster business.

" (22) And the said plaintiff further avers that the said defendant, in violation of said contract, fraudulently directed and allowed the said president of the said Diamond Wall-Finish Company, to wit, from July 1, 1894, to September 1, 1895, to supply from the plaster mill of the said defendant inferior gypsum for the manufacture of the said wall coatings by the said defendant, and that the said inferior gypsum was used by the said defendant in the

manufacture of the said wall coatings, and the said goods were placed upon the market, and rejected by the customers of the said defendant because of their inferior quality, and directed and allowed said Rathbone to supply common, instead of superior, calcined plaster to defendant during the whole life of said contract, and thereby injured and destroyed the value of the said wall coatings of the said defendant in the market of the United States, and thereby deprived the said defendant of large gains and profits, to wit, the sum of $20,000. '

" (23) And the said plaintiff further avers that after the execution of the contract aforesaid, and on, to wit, the 1st day of October, A. D. 1891, in violation of the said contract, the said defendant fraudulently encouraged the said Diamond Wall-Finish Company to infringe the said discovery and the said letters patent so granted to the said plaintiff and the said Haire, and the other letters patent aforesaid, and the said Diamond Wall-Finish Company, under the direction of the said defendant, during the time aforesaid, did so infringe the letters patent, and manufactured and sold in the United States, under the direction of the said defendant, large quantities of wall coatings made in infringement of the said letters patent and otherwise, and under the direction of the said defendant sold the goods aforesaid at a less price than the goods of the said defendant were sold, and undermined and destroyed the trade of the said defendant, and alienated its customers, injured its business, and destroyed its profits, and thereby the said defendant lost great gains and profits, to wit, the sum of $500,000.

" (24) And that the said defendant, well knowing that the said Diamond Wall-Finish Company was infringing the said letters patent, neglected and refused to prosecute for such infringements, and thereby lost large sums of money which it might have obtained in damages from the said Diamond Wall-Finish Company, to wit, the sum of $250,000.

" (25) And the said plaintiff further avers that a corporation organized under the laws of the State of New York, known as the 'Muralo Company,' on, to wit, the 1st day of January, A. D. 1894, and from thence until the 1st day of October, A. D. 1897, was engaged in the manufacture and sale in the United States and foreign countries, in competition with the said defendant in the United States, and in competition with the said plaintiff

and with the defendant in foreign countries, of wall coatings manufactured in infringement of the said letters patent, and that the business of the said Muralo Company, so carried on, was a great injury to the said defendant's business in the United States, and likewise a great injury to the business of the said plaintiff in foreign countries; and that the said defendant well knew that the said Muralo Company was carrying on such illegal and infringing business, but that the said defendant, in violation of the said contract, refused to prosecute the said Muralo Company for the infringements aforesaid, and thereby lost large sums of money that it might have obtained by such prosecution, to wit, the sum of $50,000.

"(26) And said plaintiff further avers that the said defendant, availing itself of knowledge of the foreign business of the said plaintiff through the correspondence and letters of the said plaintiff received at the office of the said defendant, fraudulently directed and procured the said Diamond Wall-Finish Company, in violation of said contract, to ship wall coatings, manufactured by it, into foreign countries where the said plaintiff had established the business of manufacturing and the business of selling the wall coatings as aforesaid, to wit, Cape Town and other points in South Africa, Sidney and Melbourne and other points in Australia, to wit, Toronto and other points in the Dominion of Canada, to wit, in India, and in other countries, and thereby deprived the said plaintiff of great gains and profits which he otherwise would have made, to wit, the sum of $40,000.

"(27) And the said plaintiff further avers that on, to wit, the 1st day of January, A. D. 1892, he discovered and invented a certain method for applying compounds, composed of gypsum and other material, to wall surfaces, either in the interior or on the exterior of buildings, and on, to wit, the 30th day of October, A. D. 1892, the invention of the said plaintiff, so made as aforesaid, became the property of the said defendant; and that the said plaintiff, on, to wit, the 18th day of February, A. D. 1892, at, to wit, the city of Chicago, in the State of Illinois, made known the said invention to the managers and directors of the World's Fair, thereafter held at the city of Chicago, aforesaid; that thereafter, and on, to wit, the 6th day of December, A. D. 1892, for the said invention of the plaintiff last mentioned, letters patent were granted by the United States to Melvin B. Church, numbered 487,606, with the

following broad claim: 'The hereinbefore described mode of applying a plastic or semi-plastic material to walls or other surfaces, the same consisting in impelling said material through a pipe and directing in a divided condition upon the said surfaces,'—which letters patent, on, to wit, February 15, 1894, together with all plaintiff's claims for infringement or royalties, were assigned in writing to said defendant by said plaintiff; that thereafter, and on, to wit, the 6th day of December, A. D. 1892, the said managers and directors of the World's Fair as aforesaid, in violation of and in infringement of the said letters patent last named, adopted the method covered by said letters patent, in infringement thereof, and used the same in the coating of the main buildings constructed for the use of the said World's Fair, at Chicago, aforesaid, and thereby greatly injured the said defendant, and deprived it of large gains and profits that it otherwise would have made, to wit, the sum of $25,000; that thereafter, and on, to wit, the 19th day of February, 1894, the said defendant instituted, in the circuit court of the United States for the Seventh circuit and Northern district of Illinois, a suit against the World's Columbian Exposition, a corporation organized under the laws of Illinois, conducting the said World's Fair, for the infringement of the letters patent last named; that the said defendant might have recovered large sums of money, to wit, the sum of $25,000, in said suit, if it had prosecuted the same, but that the said defendant, in violation of the said contract, without the knowledge of the said plaintiff, fraudulently refused to prosecute the said suit, and fraudulently and secretly discontinued the same, and thereby lost the moneys last aforesaid.

"(28) And said plaintiff further avers that, in pursuance of the policy of the said plaintiff as understood and agreed to by the said defendant, he had constructed upon the premises of the said defendant, to wit, November 1, 1892, a glue factory for the manufacture of glue for the use of the said defendant in its business as aforesaid; that the plant so constructed by the said plaintiff was imperfect in its appliances, and that, notwithstanding such imperfections, the said plaintiff thereby succeeded in making glue at greatly reduced cost, and a great saving to the said defendant; that, in order to make the same entirely practical, plaintiff proposed to the said defendant, to wit, October 1, 1893, to expend, to wit, the sum of $2,000 for

a vacuum pan for the said glue factory; that the defendant refused to authorize the expenditure aforesaid, and thereby the defendant lost large gains and profits that it might have made if said factory had been completed as plaintiff proposed, to wit, the sum of $40,000, to wit, during the life of said contract.

"(29) And the said plaintiff further avers that the profits arising from the business of the said defendant during the life of said contract, had it not been for the fraudulent conduct of the said defendant and the wrongful actions and doings aforesaid of the said defendant, would have exceeded the sum of $40,000 per year from its business other than the plaster business, and would have reached on an average, during the life of said contract, the sum of, to wit, $120,000 per year.

"(30) And the said plaintiff further avers that, by reason of the fraudulent and unlawful conduct of the said defendant aforesaid, he was deprived of large gains, profits, and salary in the business of the said defendant in the United States, and in his business in the Dominion of Canada, England, South Africa, Australia, and other foreign countries as aforesaid, and was prevented from establishing the validity, utility, and value of the discovery of the said Haire, and the processes of the said Haire and the said plaintiff, and the letters patent granted to the said plaintiff and the said Haire therefor, and the said plaintiff was thereby prevented from realizing large gains and profits from the sale of the said discovery and inventions in foreign countries, and from the manufacture of wall coatings thereunder in foreign countries, to wit, the sum of $1,000,000.

"(31) To the plaintiff's damage of $1,000,000, and therefor he brings suit."

*Uhl, Hyde & Earle,* for appellant.

*T. J. O'Brien* (*Fletcher & Wanty,* of counsel), for appellee.

MOORE, J.   The plaintiff commenced this suit in the circuit court for the county of Kent by declaration, a copy of which is found in the statement of the case.   The defendant demurred to the declaration.   The circuit judge sustained the demurrer.   The plaintiff brings the case here by writ of error.

Several reasons are set up in the demurrer why the declaration is not sufficient. The reasons relied upon in the briefs and arguments of counsel are:

"1. The declaration purports to be in an action of tort, but sets forth a cause of action on contract only.

"2. The cause of action set forth in the declaration is not the subject-matter of an action at law, and is cognizable only in a court of equity."

As to the first reason assigned in the demurrer, while it is true the cause of action arose because of the contract relations between the parties, a considerable part of the case of the plaintiff rests upon matters outside of the contract, not a part of it, but connected with and dependent upon it, growing out of the duty which defendant owed to plaintiff. The declaration comes clearly within *Chandler* v. *Allison*, 10 Mich. 460; *Allison* v. *Chandler*, 11 Mich. 542; *Oliver* v. *Perkins*, 92 Mich. 304; *Hanley* v. *Balch*, 94 Mich. 315.

As to the second reason assigned, it is claimed on the part of the defendant: "The contract set out in the declaration created such fiduciary relation between Church and the Anti-Kalsomine Company that a court of equity has exclusive jurisdiction of controversies which arise between them under the contract;" and that the case is controlled by *Petrie* v. *Torrent*, 88 Mich. 43; also citing *Pratt* v. *Tuttle*, 136 Mass. 233, and other cases. A reference to some of these cases shows them not to be in point, under our decisions. They state cases which are daily tried on the law side of our court without question.

The defendant also claims: "The contract between Church and the Anti-Kalsomine Company did not create a technical partnership. It did create a joint interest in the net profits of the wall-coating department of the Anti-Kalsomine Company's business, which was so far analogous to a true partnership that only the same remedies are available to the parties that would be available to actual partners;" and cites, in support of this proposition, the cases of *Marston* v. *Gould*, 69 N. Y. 220; *Channon*

v. *Stewart*, 103 Ill. 541; *Hallett* v. *Cumston*, 110 Mass. 32.

Defendant also claims: "Equity has exclusive juris-diction over the case set forth in the declaration in this cause, because it is too complicated in its circumstances to be tried by a jury." It is said the defendant is as much interested in the question of how the case shall be tried as the plaintiff; that it has a right to have the case so tried that there shall be a full, complete, and adequate disposi-tion made of it. It is insisted the facts in the case are so complicated that a jury could not remember them, and a trial by a jury would be a farce. Counsel cite *Blair, etc., Land Co.* v. *Walker,* 50 Iowa, 376; *Burt* v. *Harrah,* 65 Iowa, 643; *Garner* v. *Reis,* 25 Minn. 475; *Fair* v. *Stickney Farm Co.,* 35 Minn. 380; *Hedges* v. *Methodist Church*, (Sup.) 47 N. Y. Supp. 93. These cases all arose in code states, and some of them are cases such as fre-quently are tried upon the law side of our courts. This case is already commenced upon the law side of the court. The defendant asks that it be dismissed, because the law side of the court will not give the plaintiff a full, complete, and adequate remedy, and because the case comes exclu-sively within the jurisdiction of a court of equity.

It becomes important to see just what is claimed by the declaration. It commences by giving a history of the relations between the parties which led up to the making of the contract. It sets out the contract in full. It states what duties one party to the contract owed to the other. It gives a history of transactions on the part of the de-fendant which were wrongful and fraudulent, which resulted in a breach of the contract on the part of the defendant, and a loss of the profits which should have been made and shared by the plaintiff. It asks damages for this wrongful and fraudulent breach of the contract. It does not show any fiduciary or trust relation between the parties different from the relation existing between the parties to any contract to observe its terms. There is no claim in the declaration that defendant has in its hands

any property or any profits which plaintiff is entitled to share, or that there are mutual or unsettled accounts, or that the accounts are so complicated that an accounting is necessary. The claim is, in substance, that defendant fraudulently and wrongfully destroyed property and profits which should have accrued to plaintiff because of the contract relations between the parties. There is no suggestion that defendant has property in its hands as trustee for plaintiff. It does not appear that such a fiduciary relation exists between the parties as to give the court of equity exclusive jurisdiction. 1 Pom. Eq. Jur. § 157; *Ward* v. *Peck*, 114 Mass. 121; *Frue* v. *Loring*, 120 Mass. 507; *Badger* v. *McNamara*, 123 Mass. 117. Actions at law have been sustained where the fiduciary relation was said to exist. *Bennett* v. *Smith*, 40 Mich. 211; *Wright* v. *Dickinson*, 67 Mich. 580 (11 Am. St. Rep. 602); *Murphy* v. *Craig*, 76 Mich. 155; *Collar* v. *Collar*, 86 Mich. 507 (13 L. R. A. 621). But, inasmuch as the declaration does not claim that defendant has either profits, money, or property in its hands belonging to plaintiff, or in which he is entitled to share, the claim that defendant is shown to be the trustee of plaintiff is not sustained.

Upon the proposition that, inasmuch as the declaration shows there must be an accounting, therefore the case must be heard in equity, it may be said the action of account was originally cognizable only in the common-law courts, but later courts of equity exercised jurisdiction in cases of mutual account, because the remedy at law was inadequate, and have extended the remedy to many cases to which the remedy at law was never applied.

" So that now the jurisdiction extends, not only to cases of an equitable nature, but to many cases where the form of the account is purely legal, and the items constituting the account are founded on obligations purely legal. Upon such legal obligations, however, suits, although not in the form of actions of account, yet in the form of *assumpsit*, covenant, and debt, are still daily prosecuted

in the courts of common law, and legal defenses are there brought forward.    But, even in these cases, *as the courts possess no authority to stop the ordinary progress of such suits, for the purpose of subjecting the matters in dispute to the investigation of a more convenient tribunal than a jury,* unless the parties agree to a voluntary arrangement for this purpose, the cause often proceeds to trial in a manner wholly unsuitable to its real merits."   1 Story, Eq. Jur. § 442.

The case at bar is now on the law side of the court. There is a very clear intimation, in the section just quoted, that the jurisdiction is concurrent, and equity will not interfere where the case has been commenced on the law side of the court.   In 1 Pom. Eq. Jur. § 179, it is said:

"In further limitation upon the power of equity to interfere where the primary rights, interests, or estates are legal, the doctrine is well settled that, when the jurisdictions of law and of equity are concurrent, the one which first takes actual cognizance of any particular controversy ordinarily becomes thereby exclusive.   If, therefore, the subject-matter or primary right or interest, although legal, is one of a class which may come within the concurrent jurisdiction of equity, and an action at law has already been commenced, a court of equity will not, unless some definite and sufficient ground of equitable interference exists, entertain a suit over the same subject-matter," etc.

See note to section 179, 1 Pom. Eq. Jur.; *Northeastern R. Co.* v. *Martin,* 2 Phil. Ch. 758; *Smith* v. *M'Iver,* 9 Wheat. 532; *Bank of Bellows Falls* v. *Railroad Co.,* 28 Vt. 470; *Crane* v. *Bunnell,* 10 Paige, 333; *Mason* v. *Piggott,* 11 Ill. 85; *Ross* v. *Buchanan,* 13 Ill. 55.

If we rightly interpret the meaning of the words used in this declaration, it is a claim for a money judgment, wherein plaintiff claims unliquidated damages for a fraudulent breach of a contract.   This is a proper claim to be submitted to a jury.   1 Pom. Eq. Jur. § 178; *Teft* v. *Stewart,* 31 Mich. 367; *Linn* v. *Gunn,* 56 Mich. 447; *Frue* v. *Loring,* 120 Mass. 507; *Badger* v. *McNamara,* 123 Mass. 117.

It is urged that the accounts are so complicated that a jury could not retain the items, and a trial by a jury would be so long and so unsatisfactory as to be a farce. The declaration does not show there are mutual accounts, nor does it show there are long and complicated accounts upon one side. It is doubtless necessary, in a business of the magnitude shown to have been done by the defendant, to examine a good many books before conclusions shall be reached; but can it be said to be the law that in only simple cases, involving small amounts, may the parties insist on trial by jury? Shall it be said, if the case is one of importance, a jury trial cannot be had? There are not many important cases tried where either the court or the jury can remember all the items of testimony introduced, but aided by counsel, and by experts who go over the accounts and reach results, it is usually not difficult to administer substantial justice. There is legislation which is intended to reach such difficulties as are suggested here. If the case was tried in equity, it is not at all likely the judge would hear the testimony and examine the books personally, but would refer it to a master. If the parties desired, the court, in the action at law, could refer the case to referees. 2 How. Stat. § 7378. It is true the court cannot do this if either party demands a trial by jury within 10 days after issue. If this is done, the court is authorized to appoint one or more auditors to investigate the accounts, and take evidence in relation thereto, and to make a report thereon, which report may be used in a jury trial. 2 How. Stat. §§ 7386, 7391. The plaintiff having elected to try his case on the law side of the court, he is entitled to have it tried there, so far as anything appears to the contrary in the declaration.

The judgment is reversed, the case is remanded, and defendant is given 20 days in which to plead.

The other Justices concurred.