BAKER *v.* MICHIGAN CENTRAL RAILROAD CO.

MASTER AND SERVANT—RAILROADS—CONTRACTS—ASSUMPTION OF RISK.

Evidence that defendant railroad company, prior to the time decedent entered its employ as switchman, promulgated a schedule of wages and of certain rules, among which it was provided that all hose and chains on passenger trains should be cut by carmen instead of switchmen; that defendant's superior servant ordered decedent to cut the hose and chains on a train of which he composed part of the crew, and, being obliged to go between the cars, was caught and killed by the engine which coupled on to the train as he was so engaged, authorized a judgment for plaintiff on the theory that defendant violated a contract duty which decedent had a right to rely on, and decedent did not assume the risk. STEERE,

169 MICH.—39.

BROOKE, STONE, and OSTRANDER, JJ., dissenting, on the ground that decedent assumed the risk and that the negligence of his co-employés was the proximate cause of his death.

Error to Crawford; Sharpe, J. Submitted June 10, 1910. (Docket No. 40.) Decided May 3, 1912. Rehearing denied July 22, 1912.

Case by Lucile E. Baker, administratrix of the estate of Alfred Baker, deceased, against the Michigan Central Railroad Company for the unlawful killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Affirmed.

*Watts S. Humphrey*, for appellant.

*De Vere Hall*, for appellee.

McALVAY, J. Plaintiff, as administratrix, brought suit against defendant to recover damages caused by an injury to her husband, which resulted in his death, and recovered a judgment.

Plaintiff's decedent entered into the employment of defendant company as a switchman July 9, 1907, and was employed as such during all the time thereafter until the date of his injury on January 1, 1908, except for about one month, when he was working as a switchman for defendant at Grayling. At the time of his injury, he was at work with a switching crew in the yard of defendant at Bay City, West Side. The train upon which the switching was being done at the time was a regular daily passenger train, known as the Midland train, leaving West Bay City in the morning and running to Midland, about 19 miles, then returning, then going to Vassar, 22 miles, and returning from Vassar to West Bay City. This made one round trip. Two trips were made by this train every day.

Plaintiff claimed that there was a schedule or printed contract of hiring in force at the time and entered into between decedent as a switchman and defendant at the time

of his employment, which was furnished to all the switchmen. The portions material to be quoted therefrom are as follows:

"Michigan Central Railroad Company, Schedule of Wages for Switchmen. In effect west of the Detroit River, December 1, 1905. Michigan Central Railroad Co. Office of general superintendent. Commencing December 1, 1905, the following rules for switchmen west of the Detroit river will be in force:  *  *  *

"Art. 11. All hose and chains will be cut on passenger trains after they arrive at all stations before being switched by carmen wherever carmen are stationed instead of switchmen.  *  *  *

"Art. 18. Rates referred to herein will remain in effect two years from December 1, 1905.

"J. H. SNYDER,
"Assistant General Superintendent.
"Approved: R. H. L'HOMMEDIEU, General Manager."

The contention of plaintiff in this case is briefly stated by her counsel as follows:

"The entire controversy therefore is comprised within this proposition: Defendant stipulated in its written contract with the switchmen that all hose would be cut by carmen on all its passenger trains after their arrival at all stations where carmen were stationed, instead of by the switchmen, and having knowingly violated this contract made for the protection of the switchmen, and having ordered, required, and directed the switchmen to cut such hose by hand, can a switchman, who was in the exercise of due care, injured while so working, recover from defendant for such injuries?"

Before the consideration of the question propounded by plaintiff, it will be necessary to state further facts. This yard switching crew above mentioned, of which Baker, the deceased, was one, was on that day (which was a holiday) a pick-up crew, not the regular one, and was composed of five persons, viz.: Smith, conductor, O'Hare, engineer, Kratz, fireman, Baker and Shortridge, switchmen, also known as yard brakemen. This train, having made one round trip, had come in about noon, and the cars had been placed on the south Y in the yards at West Bay City for

switching, which is necessary for the purpose of putting the cars in proper order in making up the train to go out on the next trip, at about half past two. This crew was in the yard near this train, where some of them, including Baker, had eaten their dinners. A train in front of the switch engine blocked them in, and they waited for an hour or more until it moved out of the way. While the men were waiting, Yard Conductor Smith, who had charge of the train, having received his orders from General Yardmaster Jodway, came to where the men were, and gave them the orders in the hearing of Baker about cutting the hose and chains and switching the cars. The crew then proceeded with the engine to do this switching. Shortridge, Baker, and Smith rode on the running board of the engine down towards the coaches. Smith and Baker jumped off. Shortridge remained on the engine, which was to be coupled onto the baggage car. Smith and Baker started back towards the rear of the train, and Baker asked Smith if he wanted the last coach cut off. Smith replied that he did, and Baker started on the run, and went under the platforms between the cars to do this work. The engine under the control of Switchman Shortridge in coming back to couple onto the baggage car did not make the coupling. Another attempt was made, and, when they made the coupling, the cars were forced back, and Baker's head was caught and crushed between the bumpers of the two cars where he was cutting or uncoupling the chains and air hose between them. He had unhooked one of the chains, but had not uncoupled the air hose or unhooked the other chain. The hose were designed to pull apart automatically when the cars separated, but the order of defendant was that they should be uncoupled by hand.

The work Switchman Baker was doing is the work mentioned and provided in article 11 of the rules for switchmen, above quoted, to be done by carmen. Bay City (East Side) was as far as this train was scheduled to run. When it arrived there, all passengers for that place

would be let off, and it would run across the river to West Bay City, and let off passengers, if any, at that place. Both Bay City and West Bay City are stations of defendant company. There were carmen at both stations. The record shows that—

"The carmen are located at a point where there is both receiving and dispatching. * * * When regular trains come in, there are carmen there at the West Side depot to examine them and do whatever work is necessary."

The Midland train was a regular train. There is testimony tending to show that carmen were also stationed at the south Y where this train stood before it was switched to the coachyard. The record shows that on this train the work of cutting the chains and air hose was not done by carmen, but was required to be done by switchmen, and that this (with one exception) was the only passenger train so treated. Plaintiff's decedent was a good competent switchman.

Defendant contended that Bay City was the terminal for this train; that it was not scheduled for West Bay City, and, after it arrived at the former place, it became "a dead train," and was run over to West Bay City as such for switching; that no carmen charged with the duty of cutting the hose and chains on this train were stationed at the south Y where this train was run previous to switching; that the switching crew had for more than five years always cut the chains and hose on this train; that the decedent, Baker, during the time he was employed in the Bay City yard, had worked with the crew which handled this train for 60 days before the accident, and knew how the work was done; that he voluntarily assumed the risk; that, if the accident was the result of negligence, it was the negligence of a fellow-servant, and not of the defendant. At the close of plaintiff's proofs, defendant's counsel asked for a directed verdict—

"For the reason that plaintiff had failed to prove any negligence on the part of defendant, * * * and that

the failure of defendant to have the hose cut by the so-called carmen constituted no negligence, and was not the proximate cause of plaintiff's injury."

This motion was denied. At the close of the proofs, defendant's counsel moved to strike out all of the evidence relative to the schedule of wages of switchmen, more particularly section 11, for the reason that no duty was thereby imposed upon defendant that created a liability in an action of tort for negligence on account of the breach of the same. This motion was also denied. Defendant then made a motion to strike out all evidence relating to any violation of section 1, Act No. 234, Pub. Acts 1907, for the reason that no statutory liability under it had been declared on. This motion was denied. The case was submitted to the jury, and a verdict returned for plaintiff, upon which a judgment was entered. On account of errors claimed to have been committed by the trial court, defendant asks a reversal by this court before which the case is brought by writ of error.

It is insisted on the part of defendant, *first*, that this claimed contract of hiring, which contains the rule upon which plaintiff relies, was not a contract between defendant company and plaintiff's decedent, and that the record contains no evidence of any such contract between the parties; and, *second*, that, if this was a binding contract, it had never been made to apply to this train, that for years this work of uncoupling had been done by the switching crew, and that plaintiff's decedent knew of it and on the day in question voluntarily assumed all the risks incident to the work, that the failure of defendant to recognize the rule was not the proximate cause of the injury, but the negligence, if any, was the negligence of a fellow-servant.

In answer to the first contention, it may be said that the schedule or agreement in force at the time of the injury was the successor of the agreement entered into two years before between defendant and the Switchmen's Union, and contained the same provisions in article 15 as

were contained in article 11 above quoted. It was entitled, "Michigan Central Railroad Company schedule of wages for switchmen in effect west of Detroit river, December 1, 1907," and continued in effect two years. The dispute does not relate to the schedule of wages fixed and agreed upon. It seems to be taken for granted that the wage scale was universally in force in the territory covered. Nor is it insisted that the rule (article 15) was not also in force, except as to this Midland train, and one other upon this division of the road. There is evidence tending to show that this schedule was not considered by defendant company as applying only to Switchmen's Union men, and that it was given to all switchmen who were employed. The schedule itself also so provided in the following terms:

"Commencing December 1, 1907, the following rules for switchmen west of Detroit river will be in force."

And among these rules is article 15, the one invoked by plaintiff. There is evidence in the record tending to show that this agreement existed between the parties.

Defendant argues that such a contract, if binding, cannot be invoked for the second reason urged by defendant, which we have just given. As far as the instant case is concerned, to state it briefly, this means that as to the Midland train rule 15 had never been applied; that deceased knew it, and assumed the risk. Rule 15 applied to all passenger trains. The Midland train was a scheduled passenger train. Carmen were stationed at or in the vicinity of the south Y, where this train always stood before switching, but were not there for the purpose of cutting the hose on this passenger train. The switchmen were ordered and required to cut the hose by hand. It is admitted that defendant not only had knowledge that this was the manner in which this train was handled, but ordered the work to be done by the switchmen, and that it was never done in any other way. To hold with defendant in this last contention, we must find as a matter

of law, from this record, that plaintiff's decedent knew this rule was not in force as to this train and assumed the risk; because, without this knowledge, if rule 15 was within his contract of hiring, the work required would not be within the scope of his employment.

The fact that during the entire existence of this switchmen's agreement, defendant had ignored its duties under it as to this passenger train, would not relieve it of its duty thereunder towards plaintiff's decedent, unless he knew it. The record shows he was employed by defendant on or about July 9, 1907, as a yard brakeman, which is the same as a yard switchman, and it is not claimed that he had anything to do with switching this train until several months after he entered into the service of defendant. He was employed during that time at other switching work in the yards, and there is no evidence tending to show that during that time any knowledge came to him that rule 15 was not observed with all passenger trains, except as is claimed relative to this train. He had never worked with Conductor Smith before the day of the injury. None of the men who composed the crew that day belonged to Smith's regular crew, and Baker had worked with but two of them before. The direct examination of Mr. Jodway, the yardmaster, tended to show that Mr. Baker worked as a member of the switching crew which made up this train most of the days in October and November, and on the 1st day of December. On cross-examination, he gives the names of seven conductors Mr. Baker worked with during that time, not including Smith. It is evident he did not intend to say that this work occupied the whole of each day. He did not know that Baker had ever cut the hose on that train before the day he was injured. He also said that Baker last switched this train October 27th. Mr. Shortridge, the other brakeman who was in the crew with deceased on the day he was injured, and who had worked for defendant about two months in the yard as switchman, and who was an experienced switchman, testified that he had worked with

deceased on Water street, where there were no passenger trains or coaches; that witness had worked switching this Midland train most of the time since he began, including November and December; that he never knew of Mr. Baker working on this train before the day of his injury, and never knew of his cutting hose or chains on that curve; that Baker had been working on Water street most of the time, and, so far as he knew, had not worked with this crew during November. Shortridge testified, further, that he did not know that Baker had done this work before, that Baker asked him what was the first thing they were going to do, and witness told him. The fireman on this engine testified that he had never seen Baker around this place before that day. No one of the seven different conductors mentioned by the trainmaster was produced as a witness. In view of this contradictory evidence, this court cannot say, as a matter of law, that the record shows plaintiff's decedent had waived the terms of the schedule and assumed the risk.

Another contention of the defendant is that decedent volunteered to do the work in which he met his death, and therefore assumed all the risks incident thereto. It appears from the record that the conductor received his orders from the proper authority to do this work, and communicated these orders to the crew, which they proceeded to execute as soon as the track was clear. So far at least there is no disagreement that this work was ordered to be done. The claimed voluntary act on decedent's part is founded upon the conductor's testimony to the effect that after the engine had brought the crew to where this train was standing, and he with the conductor was going towards the last car, Baker said, "Do you want that last coach cut off?" to which the conductor replied, "Yes," and decedent hurried forward to do the work. Smith was the one in authority to whose directions obedience was required. The court properly left the question to the jury. 1 Labatt on Master and Servant, § 440 (*a*), and cases cited.

It is argued that defendant's failure to have the hose cut by carmen was not the proximate cause of decedent's injury. It appears to us to be evident that rule 15 was adopted as the result of the experience of defendant in operating its road and in recognition of the dangers to switchmen from injuries arising from the necessity of going between and under cars for any purpose, just as legislation requiring the use of automatic couplers was brought about, and that the purpose of such rule was the protection of switchmen. It was an express recognition of the great risk to which they were exposed in attempting to do such work upon cars liable to be moved at any time. By this rule a class of workmen was provided to perform this work in perfect safety. The risk of performing it was entirely removed as to all switchmen protected by its provisions. If this is true, the fulfillment of the agreement would avoid the necessity of the performance of the work by switchmen, and the negligent failure by defendant to perform would be the direct incitement to the work, not an independent act. Such negligence would create the necessity. Whether a duty is imposed by statute or by contract, a negligent failure to perform creates a liability. A reputable text-writer says:

"An action for personal injuries may be based upon a contract, if there is an agreement imposing a legal duty upon one person for the protection of another. In such case, the duty imposed by contract is the same as that imposed by the law itself, and the breach of that duty would constitute a tort, founded upon a contract." 1 White on Personal Injuries on Railroads, § 16, citing Addison on Torts, p. 13, and 1 Cooley on Torts (3d Ed.), p. 155.

To make such negligence the proximate cause of an injury, it must be the natural and probable consequence of the negligent act, which, under the circumstances, an ordinarily prudent person ought reasonably to have foreseen might probably occur as the result of his negligent act. Where an act is negligent, to render it the proximate cause, it is not necessary that the one committing it might

have foreseen the particular consequence or injury, or the particular manner in which it occurred, if by the exercise of reasonable care it might have been anticipated that some injury might occur. 29 Cyc. p. 492 *et seq.*, notes and cases cited. In view of the fact that the agreement was to protect switchmen from injury, it is clear that the injury complained of was such as an ordinarily prudent man ought to have foreseen might probably occur in case of failure to perform. If we consider in the instant case this agreement to be an automatic coupler which a statute required should be provided to perform this uncoupling, and which defendant negligently omitted, it would not require much argument to convince a court that such negligence was the proximate cause of the resulting injury. It should be stated that all of our conclusions in this case are based upon the proposition that plaintiff's contentions are found to be true, and plaintiff's decedent was without fault.

Defendant contends that the negligence, if any, which caused injury, was the negligence of a fellow-servant. We do not think that the fellow-servant doctrine can be relied upon as a defense in this case. Under the claimed contract of employment, defendant stipulated and agreed that the cutting of all hose and chains should be done by carmen before switching, and not by switchmen. These acts were not only not delegated to switchmen to be performed, but switchmen were prohibited from performing them. The injury occurred while plaintiff's decedent, under orders from his conductor, was attempting to perform a duty outside of his contract and prohibited by it. The other switchman, Shortridge, who is the alleged fellow-servant, was coupling the engine onto the baggage car, which was within his delegated duties.

A doubt is raised as to whether the relation of fellow-servant existed between them. Whether or not they were fellow-servants, if in this case switchmen had been prohibited by statute from cutting hose and chains, but had been required to do so by defendant's orders, could

the negligence of Shortridge be interposed as a defense? The decisions of the Supreme Court of the United States in cases involving the Federal safety appliance act (Act March 2, 1893, chap. 196, 27 U. S. Stat. 531 [U. S. Comp. Stat. 1901, p. 3174]) will be helpful in determining this question. That statute in terms relieves the employé from the assumption of risk, but the reasoning of these cases is broad enough to support the contention that such risk would not be assumed in the absence of the specific provision, for the reason that the law was violated by defendant in not providing automatic couplers, and the cases clearly repudiate the reliance upon the fellow-servant doctrine. In a comparatively late case, that court, quoting with approval from *Johnson* v. *Southern Pacific Co.*, 196 U. S. 1 (25 Sup. Ct. 158), as follows: "The object of the statute was to protect the lives and limbs of railroad employés by rendering it unnecessary for a man operating the couplers to go between the ends of the cars" —held that the statute exonerated an injured employé from assumption of risk in the following language:

"We are clearly of opinion that Schlemmer's rights were in no way impaired by his getting between the rails and attempting to couple the cars. So far he was saved by the provision that he did not assume the risk. The negligence, if any, came later. * * * But, suppose the nonsuit has been put clearly and in terms on Schlemmer's raising his head too high after he had been warned. Still we could not avoid dealing with the case, because it still would be our duty to see that his privilege against being held to have assumed the risk of the situation should not be impaired by holding the same thing under another name. If a man not intent on suicide, but desiring to live, is said to be chargeable with negligence as a matter of law when he miscalculates the height of a car behind him by an inch, while his duty requires him, in his crouching position, to direct a heavy drawbar moving above him into a small slot in front, and this in the dusk, at nearly nine of an August evening, it is utterly impossible for us to interpret this ruling as not, however unconsciously, introducing the notion that to some extent the man had taken the risk of the danger by being in the

place at all." *Schlemmer* v. *Railway Co.*, 205 U. S. 13, (27 Sup. Ct. 409).

In another case, in construing the same Federal act which provides, among other things, that "no cars either loaded or unloaded shall be used in interstate traffic which do not comply with the standard," etc., and where the injury was caused by the fact that the drawbars originally constructed of the standard height "lowered by the natural effect of proper use" and the duty to keep them up to standard by the use of metallic wedges called "shims," which were provided for that purpose, devolved upon the conductor or brakeman, the court held:

"On this state of the evidence the defendant was refused instructions, in substance, that if the defendant furnished cars which were constructed with drawbars of a standard height, and furnished shims to competent inspectors and trainmen, and used reasonable care to keep the drawbars at a reasonable height, it had complied with its statutory duty, and, if the lowering of the drawbar resulted from the failure to use the shims, that was the negligence of a fellow-servant for which the defendant was not responsible. In deciding the questions thus raised, upon which the courts have differed (*St. Louis & S. F. R. Co.* v. *Delk*, 158 Fed. 931 [86 C. C. A. 95, 14 Am. & Eng. Ann. Cas. 233]), we need not enter into the wilderness of cases upon the common-law duty of the employer to use reasonable care to furnish his employé reasonably safe tools, machinery and appliances, or consider when and how far that duty may be performed by delegating it to suitable persons for whose default the employer is not responsible. In the case before us the liability of the defendant does not grow out of the common-law duty of master to servant. The Congress, not satisfied with the common-law duty and its resulting liability, has prescribed and defined the duty by statute. * * * The obvious purpose of the legislature was to supplant the qualified duty of the common law with an absolute duty deemed by it more just. If the railroad does, in point of fact, use cars which do not comply with the standard, it violates the plain prohibitions of the law, and there arises from that violation the liability to make compensation to

one who is injured by it." *St. Louis, etc., R. Co.* v. *Taylor*, 210 U. S., at page 294 (28 Sup. Ct. 620).

In this line of cases the Supreme Court of the United States has held that this statute supplants the common-law rule of reasonable care on the part of the employer as to providing the appliances required, and imposes an absolute duty. By parity of reasoning, if in this case a duty was imposed upon defendant by contract, it became an absolute duty, and there was no assumption of risk on the part of plaintiff's decedent, nor can the doctrine that the injury resulted from the negligence of a fellow-servant be invoked.

Error is assigned by defendant upon the refusal of the court to grant its motion "to strike out all of the evidence relative to a violation of section 1, Act No. 234, Pub. Acts 1907, and refused to instruct the jury that the question of a statutory violation was not before them for consideration." At the close of plaintiff's case, defendant moved the direction of a verdict upon eight specific grounds, none of which mentioned this statute, as appears from the record:

"Plaintiff rests.

"Motion to direct a verdict for the defendant was made by defendant's counsel on the following grounds:

"(1) Plaintiff has not made any case showing any negligence of defendant entitling her to a verdict.

"(2) There is no proof that Baker was orde ed to go between the cars, and the proofs show that in doing so he was a volunteer.

"(3) If he had been instructed to do the work, it was work he was familiar with, and he was hurt by the negligence of his fellow-servants of the crew who backed the car against him.

"(4) If the contract with the switchman's union was violated, that is no ground of recovery in this tort action.

"(5) Such contract was waived by Baker when the hose was found uncut, and he started to cut it.

"(6) Baker was guilty of contributory negligence in going between the cars before he knew they were not going to be moved again.

"(7) His injury and death resulted from one of the

dangers, the risks of which he had assumed, namely, the risks in going between cars liable to be moved.

"(8) The failure of defendant to have the hose cut by carmen was not the proximate cause of the injury, and there was no negligence for which defendant is responsible proximately or concurrently causing the injury.

"After such motion and argument thereon, the court overruled said motion."

The plaintiff did not declare upon a violation of this statute, nor is there any evidence in the case with reference to it. In denying the motion the court gave his reasons at considerable length, from a sentence of which it would appear that this act had been mentioned in the argument as will appear from the opening sentences of his conclusions."

"I perhaps should state what I consider the questions involved. The grounds of negligence upon which plaintiff relies are, *first*, the defendant's negligence to equip the cars in question to make it comply with the act of 1907 relative to automatic couplers; *second*, the failure to have the air hose disconnected by carmen and in what they claim to be one of the conditions under which plaintiff was employed as a switchman by the defendant. Defendant denies that negligence in every respect has been proven, and insists that the injury was caused by the negligence of the fellow-servant, and also that his own negligence contributed thereto. I think that states the claim of counsel fairly."

Plaintiff gives as an explanation of this statement of the court, in his brief, that, in answering defendant's argument on this motion, he urged that the action of defendant in requiring switchmen to cut the hose by hand was not only a violation of the contract, and negligence, "but suggested that in requiring them to enter between the cars to cut the hose by hand, when uncoupling cars, that there was a violation of said Act No. 234," and cited in support of his contention a case involving the Federal safety appliance act, from which Act No. 234 was taken, viz.: *United States v. Boston & M. R. Co.* (D. C.), 168 Fed.

148, 152. We do not find that this explanation is disputed.

At the conclusion of all the proofs in the case, counsel for defendant, among others, made the following motions:

"*Second.* To strike out all evidence relating to any violation of section 1 of Act No. 234, for the reason that defendant was not engaged in hauling cars at the time of the accident.

"*Third.* A like motion, for the reason that no statutory liability was declared on. Also a like motion for same reason as in second above."

The court stated that he did not understand what evidence was referred to. Counsel for defendant said:

"All evidence relating to the fact that they had violated this statutory provision."

The court then said:

"It is so intermingled with the other evidence that I don't see how I could strike it out. You may cover it by a request that I charge in a certain way relative to that so that I can rule on it."

The motions were denied, and the requests upon the subject were refused. The statements of the court, upon denying the motions of defendant above presented, were not instructions to the jury, and the charge of the court states that they were not made in the presence of the jury. No evidence is pointed out by counsel for defendant which was admitted for the purpose of showing a noncompliance with the provisions of Act No. 234 of 1907; nor do we find that the case was tried or submitted by the court upon such a theory. The statement of the court relative to the grounds of negligence relied upon by plaintiff, at the close of the law arguments upon these motions, in our opinion, was intended to apply only to the argument made by plaintiff that the negligence complained of amounted to a disregard of that act. It appears that the charge of the court excluded the consideration of this act by the jury, and the case was submitted upon the following proposition, as appears from the charge:

" The plaintiff bases her claim or right of recovery upon two alleged claims of negligence:

" *First.* It is claimed that the defendant company was negligent in failing to require its carmen to cut or uncouple the air hose connecting the cars of the train about which deceased was employed as a switchman, thereby necessitating his or some other switchman's entry between such cars for that purpose.

" *Second.* Plaintiff claims that defendant was negligent in ordering and directing her husband to enter between such cars to uncouple such air hose, thereby exposing him to a danger outside of the terms of his employment."

We find no error in the refusal of the court to direct a verdict for defendant at the close of plaintiff's case, nor for refusing the motions and requests to charge relative to Act No. 234 of 1907. The question of the contributory negligence of plaintiff's decedent was submitted to the jury for determination. In any view of the case, this is not a matter for complaint on the part of defendant.

The other errors assigned, which are referred to in defendant's brief, relate to certain portions of the charge of the court. The charge, with the exception of immaterial portions concerning which no question is raised, is given as a footnote to this opinion,[1] with the portions claimed to be erroneous in parentheses as printed by appellant. If

---

[1] CHARGE OF THE COURT.

The plaintiff bases her claim or right of recovery upon two alleged claims of negligence.

*First.* It is claimed that the defendant company was negligent in failing to require its carmen to cut or uncouple the air hose connecting the cars of the train about which the deceased was employed as a switchman, thereby necessitating his or some other switchman's entry between such cars for that purpose.

(*Second.* Plaintiff claims that defendant was negligent in ordering and directing her husband to enter between such cars to uncouple such air hose, thereby exposing him to a danger outside the terms of his employment.)

Now it appears that at the time of the injury to plaintiff's husband there had been an arrangement or agreement entered into between certain persons representing the switchmen and cer-

this charge is read in connection with this opinion, it will appear that many of defendant's objections are already passed upon.

As to the other parts of the charge to which defendant has excepted, we do not find that they were misleading or confusing to the jury, or that the jury was left to speculate upon the question of damages. Considered as a whole, as every charge should be, we discover in it no reversible or prejudicial error.

The judgment is affirmed.

MOORE, C. J., concurred with McALVAY, J. BLAIR and BIRD, JJ., concurred in the result.

STONE, J. (*dissenting*). I regret that I am unable to agree with Justice McALVAY in the conclusions which he has reached in this case. While agreeing in the main with his statement of facts, I desire to call attention to one or two matters not specifically referred to by him. I first refer to a portion of the cross-examination of William C. Shortridge, the plaintiff's principal witness.

In describing the manner in which plaintiff's decedent approached the three cars on the track, after Smith and plaintiff's decedent left the switch engine and started toward the cars, the witness testified as follows:

tain officials of defendant company, which were printed, and plaintiff claims a copy thereof given to defendant's switchmen, including her husband. Besides agreeing upon and fixing the schedule of wages for switchmen, it contained an article or paragraph numbered 15, which reads as follows: "All hose and chains will be cut on passenger trains after they arrive at all stations, before being switched, by carmen, wherever carmen are stationed, instead of switchmen."

(Now if you find that West Bay City was a station along the line of defendant's road, and that carmen were stationed thereat, then it was the duty of defendant company under this arrangement, if you find it was one of the conditions of Mr. Baker's employment, to have its carmen do this work, and if you find that such men did not do this work, and the officials in charge of defendant's yards and business at West Bay City knew that they did not, and for that reason required the switchmen generally, and Mr. Baker as one of

"He hadn't got to the cars when the first coupling was attempted to be made. He was walking alongside of the car.

"Q. Now, it was after that, after you had attempted to make the first coupling, that he went in between those cars, wasn't it?

"A. Yes, sir.

"Q. He must have been in there at the time the second coupling was made?

"A. Yes; he must have been, certainly.

"Q. Now, it is a matter of common knowledge among all of you, isn't it, it frequently happens, that the first coupling isn't made?

"A. Yes, sir.

"Q. That is an ordinary incident to railroading?

"A. Yes, sir.

"Q. That the coupling, in order to make that, they have to make the attempt the second time?

"A. Yes, sir.

"Q. Anybody that has worked around cars for a week, and isn't—especially in a switchyard where they are making couplings—would know that that was liable to happen any day, wouldn't they?

"A. Yes, sir; he would.

"Q. And Mr. Baker must have known that you might have missed your first coupling?

"A. Yes, sir.

"Q. And that you might have to try to make it again?

"A. Yes, sir.

---

them, to enter between passenger cars and uncouple the air hose, this would be an act of negligence on the part of the defendant, and if you find that such act of negligence caused or contributed to Mr. Baker's injury, and that his own negligence did not contribute thereto, then the plaintiff can recover in this case such damages as you may find he is entitled to.)

(Considering the second of the two grounds last stated by me, I charge you that under the contract of employment existing between such husband and defendant, if you find it so existed, it was the duty of the defendant to have required its carmen to cut and uncouple the hose or chains connecting the cars of the trains about which the husband was working, thus obviating the necessity on his part of being required to enter between such cars for said purpose), and (if you find that the said conductor so in charge of his work negligently ordered and directed said husband to enter between such cars to cut and uncouple said hose or chains, and as a

"*Q.* Now, you yourself gave the signal for the engineer to make that attempt the second time, didn't you?

"*A.* Gave the signal to the fireman, because the fireman was on this side of the engine. I gave them the signal to back the engine into the cars to try it again, to try to couple it again. I was in charge at that point in making that coupling at that particular time. The engineer and the fireman would answer my signals, and they obeyed my signals, and attempted to make the second coupling, and at that time, I believe, was when Mr. Baker was caught. There was no other movement of the car that would catch him."

Referring to the manner in which the Midland train had been handled for upwards of five years, Solomon A. Jodway, a witness on behalf of defendant, testified on direct examination as follows:

"*Q.* Did Mr. Baker at any time during his employment there handle this Midland train?

"*A.* Yes, sir.

"*Q.* You may state, if you have the means, as to how much of his time he had been engaged at a point where he handled this train coupling and uncoupling it?

"*A.* During the month of October, 1907, he worked with the crew that done this particular work 27 days.

"*Q.* Did that crew on those 27 days each day handle this train, or these cars; that is, take them to the yard, couple and uncouple them?

"*A.* Yes, sir.

---

proximate cause of such order and direction he did so enter, and that this exposed him to a danger outside the terms of his contract of employment, and while so attempting to perform his work, and in the exercise of due care, and without fault upon his part, he was caught between the ends of said cars and came to his death from injuries so received, then plaintiff is entitled to recover such damages as she has shown that his estate, and she as its administratrix, have thereby sustained.)

In addition to the definition of negligence given you, I further say to you that negligence is defined to be or to consist in the failure to observe that degree of care which the law requires for the protection of interests likely to be injuriously affected by the want of it, and the degree of care required in this as in all other cases must be in proportion to the danger existing; and the duty to guard against such danger, if it does exist, increases in direct ratio

"*Q.* How much of the time did he work with this crew handling this train in November ?

"*A.* Twenty-eight days.   He worked with this crew one day in December.

"*Q.* Mr. Jodway, how long prior to the injury has this Midland train been handled over that Y to the coachyard by the switching crew ?

"*A.* I should judge from five to eight years."

Upon cross-examination of this witness he stated:

"I never saw Baker or any other man cut the hose on this particular train.   *   *   *   Baker last switched this train on October 27th."

The testimony of this witness, qualified as it is by his cross-examination, to my mind is the only positive evidence as to the length of time Baker had worked and assisted in handling the Midland train.   The other testimony upon the subject is of a negative character, of witnesses who either had not seen him there or had not been with him there.   A careful reading of this record leads us to the conclusion that Baker fully understood the manner in which this Midland train had been handled for months previous to his injury, and that he had himself worked about that train at least during the month of October, 1907.   The undisputed evidence shows him to have been an intelligent, bright man.   We can come to no other conclusion than that he understood the situation.

---

with the amount of danger to which those in a position to be affected thereby must be exposed.   This definition covers, not only the negligence that must be shown by plaintiff as against defendant, but also the want of negligence, termed contributory negligence that she must show that her husband was not guilty of.

(Something has been said to you about the negligence of the remaining switchmen of the crew and of the conductor, engineer, and fireman, one or more, being the cause of the injury to and death of the husband of plaintiff, and I charge you that, if such injury or death was caused or contributed to solely by any negligence of any of these employés, then plaintiff cannot recover.)   (On the other hand, should you find that said injury and death were either caused or contributed to by the negligence of defendant company in any of the regards covered by me in this charge, then the negligence of any such employé concurring with the defendant in such

Much stress is laid by Justice McALVAY upon the existence of what is termed the schedule, agreement, or contract, consisting of plaintiff's Exhibit 1, which contains the following article:

"All hose and chains will be cut on passenger trains after they arrive at all stations before being switched by carmen wherever carmen are stationed, instead of switchmen."

It is not claimed that Baker was a member of the Switchmen's Union. There is no testimony in the case to warrant the conclusion that plaintiff's decedent ever had in his possession, or ever saw, or ever knew of the existence of, this so-called agreement or schedule. It is true that the witness Shortridge says that he (Shortridge) received a copy of the schedule and regulation soon after his employment, and that it was given to other switchmen. As to the knowledge of this document on the part of plaintiff's decedent, the testimony of the witness Shortridge does not arise to the dignity of evidence. But it is urged by plaintiff's counsel that this so-called regulation formed a part of the hiring of plaintiff's decedent. Manifestly, if plaintiff's decedent had no knowledge of its existence, it could not have formed a part of his contract. But conceding, for a moment, that there was some evidence that

---

regard would not prevent the recovery by plaintiff, provided you find that such concurring negligence was the proximate cause of said injury and death, and such husband was at the time in the exercise of due care and without fault on his part.)

I don't know that I made that proposition as clear to you as I would like. Counsel has gone over it quite fully on both sides in their argument to you. An injury may be the result of two causes concurring together. (I might illustrate an instance of that kind, but I shall not do so. I think you appreciate what I mean by that. There may be two causes. In this case, if you find—I have given you instructions as to the negligence of the defendant in requiring the plaintiff's husband to uncouple those hose, which would amount to negligence, you may find, also, that it was negligence on the part of the switchmen to have given the signal to the engineer to back up to couple onto the car until he knew that this brakeman was out of danger. Now, what I mean to say to you is this: If

Baker had knowledge of the existence of this regulation or schedule, the evidence is undisputed that for upwards of five years, at least, the operation of the rule or regulation had never been applied to the Midland train. This being so, and there being an entire absence of testimony that plaintiff's decedent ever made any complaint because this schedule was not in operation, it must be held that there was a waiver of this regulation, rule, or agreement as between plaintiff's decedent and the defendant. If there was ever a contract between these parties of this nature, it would be perfectly competent for them mutually to waive the terms of the same. It is urged by the plaintiff, however, that the force or effect of this regulation is equivalent to that of a public statute imposing duties upon the defendant. We do not so understand the rule. Justice McALVAY quotes from section 16 of 1 White on Personal Injuries on Railroads, as follows:

"An action for personal injuries may be based upon a contract, if there is an agreement imposing a legal duty upon one person for the protection of another. In such case, the duty imposed by contract is the same as that imposed by the law itself, and the breach of that duty would constitute a tort, founded upon a contract."

The following authorities are cited by the text-writer: Addison on Torts, p. 13; 1 Cooley on Torts (3d Ed.), p.

---

you find that his injury was caused by the concurring negligence of these two parties, the negligence of the defendant company in the way I have stated, and also the negligence of the switchmen, then the plaintiff could recover in this case. The mere fact that the switchmen may have been negligent would not destroy the right of plaintiff's recovery if defendant company was negligent.) If, however, you find that the action of the switchmen was the proximate cause—was the real cause, as we may use the term in expressing it—the principal cause, the efficient cause of his injury, then the plaintiff could not recover in this case, because the switchmen and he were fellow-servants, and, under the law in this State as it was at the time that this accident occurred and the deceased was injured, a man in an occupation such as plaintiff's husband could not recover for any injury which was caused by the negligence of a fellow-servant. And I say to you, as a matter of law,

155 *et seq.; Rich* v. *Railroad Co.*, 87 N. Y. 382 (80 N. E. 206). The illustration used by White on such liability is stated to be found in the case of the contract of the carrier of a person for hire, for the breach of which contract an action would lie against the carrier for the negligent injury to the passenger. But the same author continues in this language:

"But ordinarily, the essence of the action for the tort consists in the violation of the duty owed the individual, as a thing different from the obligation assumed under the terms of the contract."

Turning to the case of *Rich* v. *Railroad Co.*, *supra.*, we find it stated that while an omission to perform a contract-obligation is not a tort, unless the omission is also the omission of a legal duty, such legal duty may arise not merely out of certain relations of trust and confidence inherent in the nature of the contract itself, but may spring from extraneous circumstances not constituting elements of the contract as such, although connected with and dependent upon it. In that case plaintiff's complainant alleged, in substance, among other things, that he was the owner of lands in the village of Yonkers, adjoining the former site of defendant's depot at that place; that because of the vicinity of the depot said lands were valuable for

that the engineer, fireman, conductor, and other switchmen engaged with him were at that time fellow-servants of his.

By the term proximate cause I mean the natural and the efficient cause or that which immediately preceded and produced a given effect, as distinguished from some remote or immediate cause.

(After a full and careful consideration by you of the situation and all facts and circumstances shown, if it appears to you from a fair preponderance of the evidence that the negligence of defendant in any of the regards stated by me was the proximate cause of the injury to and death of said husband, and that he, himself, at the time was in the exercise of due care and free from fault, then I charge you that plaintiff is entitled to recover as stated by me); on the other hand, if you find that the defendant was not negligent in any such regards, or that it was negligent, but that such negligence was not the proximate cause of such injury and death, or find that such injury and death were caused by any negligence on

business purposes, and plaintiff had erected thereon stores and buildings, having borrowed the money for that purpose, which was secured by mortgage on the property; that because of the refusal of plaintiff and others to surrender to defendant, without compensation, certain valuable riparian rights, defendant moved its depot, whereby plaintiff's property was greatly depreciated in value, and could only be restored and saved from foreclosure by restoration of the depot; that, to secure this, the plaintiff entered into a contract with defendant by which he surrendered to it said riparian rights, in consideration of defendant's agreement to re-establish within a reasonable time and forever thereafter to maintain its depot at the former site, and thereupon the mortgagee agreed to delay a foreclosure sale; that defendant built its depot on the old site, but because of plaintiff's refusal to consent to the closing of a street, which would seriously injure his property, without compensation in damages, said defendant, fully understanding plaintiff's position, wilfully and maliciously violated its contract, and delayed a restoration of the depot for the express purpose of preventing plaintiff from being enabled to ward off a foreclosure, and instigated and induced the mortgagee to foreclose, and the property was sold at a great sacrifice. Upon the trial of the action, it

the part of said husband contributing thereto, then I charge you that plaintiff is not entitled to recover, and your verdict should be for defendant.

Defendant denies that it has been guilty of any of the acts of negligence complained of, and claims that Mr. Baker's injury resulted from his own negligence, or that of one of his fellow-servants, or both. Now, as I have said to you, if the negligence of Mr. Baker caused or contributed to his injury, she cannot recover. (And I further say to you that, if you find that the proximate cause of his injury was the negligence of one of the train crew with which he was working, then she cannot recover. But, as I before said to you, if you find that his injury was caused by both the negligence of his fellow-workmen, and the defendant under the instructions I have given you, and that these acts of negligence concurred in causing his injury and death, then the defendant would still be liable, if Mr. Baker himself was free from fault.)  *  *  *

was conceded that a good cause of action sounding in tort was stated in the complaint. Plaintiff offered to prove the agreement to restore the depot and its breach; that the restoration would have greatly enhanced the value of plaintiff's property; also to show what defendant did in procuring and instigating the foreclosure sale; also, the declaration of the defendant's officers as to the reasons for refusing to restore the depot. These were rejected as immaterial, and the court of appeals held that such ruling was error. In the course of the opinion the following language is used:

"It may be granted that an omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty. * * * Whatever its origin, such legal duty is uniformly recognized, and has been constantly applied as the foundation of actions for wrongs; and it rests upon and grows out of the relations which men bear to each other in the frame work of organized society. It is then doubtless true, that a mere contract obligation may establish no relation out of which a separate or specific legal duty arises, and yet extraneous circumstances and conditions, in connection with it, may establish such a relation as to make its performance a legal duty, and its omission a wrong to be redressed. The duty and the tort grow out of the entire range of facts of which the breach of the contract was but one.

If you find for the plaintiff, then the next question is, how much; and that, gentlemen of the jury, is a serious question. It is a serious question when 12 men such as you are are charged with the duty and responsibility of saying how much money one man—or a corporation, it does not make any difference—should pay to another when there isn't any contract between them. If one man agrees with another that he will pay him a note at a certain time, then there would not be any trouble about the question as to how much should be paid. It would be the amount of the note and the interest. But in a case of this kind there isn't any way in which evidence can be offered, and no evidence has been offered here, excepting along the line of probabilities, you understand. (No one can go upon the stand and swear just how much the pain and suffering this man endured, if you find that he endured any pain and suffering, during the hours that he lived, are worth, or how much the plaintiff should receive in compensation therefor. But the law imposes

The whole doctrine is accurately and concisely stated in 1 Chit. Pl. 135, that, 'if a common-law duty result from the facts, the party may be sued in tort for any negligence or misfeasance in the execution of the contract.'"

Turning to 1 Cooley on Torts (3d Ed.), p. 155, we find the following language:

"Passing now from a consideration of torts as they are found to be akin to or coincident with public wrongs, we may briefly direct attention to another side, on which they seem to be mere breaches of contract. Indeed, in many cases an action as for a tort or an action as for a breach of contract may be brought by the same party on the same state of facts. (*Church* v. *Anti-Kalsomine Co.*, 118 Mich. 219 [76 N. W. 383]). This, at first blush, may seem in contradiction to the definition of a tort, as a wrong unconnected with contract; but the principles which sustain such actions will enable us to solve the seeming difficulty"—citing and quoting at large in the note from *Rich* v. *Railroad Co., supra*.

"If one by means of a false warranty is enabled to accomplish a sale of property, the purchaser may have his remedy upon the contract of warranty, or he may bring suit for the tort. The tort consists in his having been, by fraud and falsehood, induced to make the purchase. There is a broken contract, but there is also something more. There is deception to the injury of the purchaser in procuring the contract to be made. Suit may be brought on the contract, ignoring the fraud; but it may also be

---

upon you 12 men the duty of determining what amount the plaintiff, if you find she is entitled to recover in this case as administratrix of her husband's estate, should have.)   *   *   *

In estimating such damages, you should consider the earning ability of Mr. Baker and the length of time that he probably would have lived had he not been injured, and the loss his estate has sustained by being deprived by such injuries of the ability to labor and earn money during the time he probably would have lived had he not been injured. (If you find that plaintiff is entitled to damages, you should also allow her as administratrix of her husband's estate such a sum as in your opinion will reasonably compensate for any pain and suffering you may find that he endured from the time of his injury to the time of his death.)

Should you find for the plaintiff, it is for you to say under the evidence what amount the said husband and his estate lost yearly, if any, by reason of his injuries and death, and you will consider

brought for the fraud, and then the contract will not be counted on, though it will necessarily be shown, in order to make it appear how the deception was injurious. The tort in such a case is connected with the contract only as it enabled the tort-feasor to bring the party wronged into it."

Other illustrations are given by the author, instancing cases for malpractice by a physician, which may be either upon a contract or tort; also cases where the defendant, having received the property of the plaintiff under a contract to sell the same and return the proceeds, had sold the property and converted the proceeds to his own use, and it was held that either trover or assumpsit would lie. Numerous other illustrations of the rule are given. We have quoted thus at length from the text-writers and authorities to show what in our judgment is the utter inapplicability of the rule here invoked to a case of this nature.

Here, if there ever was a contract relation such as is claimed by the plaintiff, the contract was waived and practically abrogated by both of the parties thereto for a long period of time, and such waiver by their conduct was fully acquiesced in. Such a contract so treated bears no analogy to a public statute, and stands on an entirely different footing from public statutes or municipal ordi-

the time that he probably would have lived, and the effect that advancing years would have had upon his ability and capacity to earn the money that he had theretofore been earning, and you will also consider that this money would be paid to him at intervals from year to year, from one year to another, estimate the present worth or value of that earning which was lost, if any, from the time of such injury and death for the years that you find the said husband would probably have lived, and plaintiff will be entitled to that sum as the item for loss of earnings, and this will be in addition to any amount that you will find plaintiff is entitled to, if any, because of the pain and suffering so endured by him. * * *

In estimating the amount, if any, that plaintiff is entitled to recover, you should consider the personal character of her husband as shown by the evidence, his mental and physical capacity, his habits of economy, industry or otherwise, his health, and whether at the time of his injury he was afflicted with any disease or physical infirmity that would be liable to reduce his earning power and

nances, which cannot be waived or abrogated. In *Dixon* v. *Railway Co.*, 155 Mich. 169 (118 N. W. 946), this court held that rules defining the duties of certain employés, to whom the running and immediate control of trains is confided, are essentially private regulations of the master in the orderly and prudent conduct of its business, and do not fix the obligations and liabilities of the master to its servants, nor to third persons and the public, those obligations, being fixed by law, cannot be diminished by such rules, nor, ordinarily, increased thereby. See, also, *McKernan* v. *Railway Co.*, 138 Mich. 519 (101 N. W. 812, 68 L. R. A. 347); *Fonda* v. *Railway Co.*, 71 Minn. 438 (74 N. W. 166, 70 Am. St. Rep. 341).

There is much force in defendant's position that by the practical construction of the schedule, so called, it did not apply to this train at the south Y, and that Baker, as well as the defendant, if such schedule ever did apply, had waived its terms. The mere fact that this schedule was in writing gives it no greater force than as though it rested in parol. If a builder in employing men to construct a brick building should hire six wheelbarrow men and six hod carriers, and set them at work at their appropriate duties, and should subsequently say to them, "from this time on you will all become hod carriers," and they

shorten his life, consider his capacity and disposition to earn as shown by the evidence in the case, the amount that he was earning and the amount which under the testimony it is reasonably probable that he would [have continued to earn in the future, but for his injury, the probable length of time he would have continued to live, and all other facts, conditions, and circumstances appearing by the evidence which tend to throw light upon or aid you in reaching a fair conclusion as to the amount of pecuniary loss which you find that his said estate has sustained by reason of his injury. * * *

Now, gentlemen of the jury, I don't know that I can say anything farther that would aid you in determining this case. It has been somewhat lengthy, and you have given it careful attention. As counsel said to you, a good many legal questions have arisen during the case that have been discussed largely during your absence. You should not draw any inference from that matter at all.

acquiesced therein and entered upon such duties with full knowledge of the situation, and continued therein for months or years, we think it could not be said that they did not assume the usual risks of the latter employment.

Passing by many of the positions discussed by counsel, we are satisfied that this case must be disposed of under the rules applying to the ordinary case, where it is claimed that the defendant has violated its duty under the general doctrines applicable to master and servant. It is very apparent that there was no danger in cutting the hose between the three cars that stood disconnected from any engine upon the track. The injury arose in the manner in which the work was sought to be accomplished. The instructions had been to place these cars in the coachyard. The cars were as harmless when coupled as they were when uncoupled. In the testimony of the witness Shortridge his attention was called to certain rules of the company with which he was familiar. Among those, was rule 629, which reads as follows:

"Great care must be exercised by all persons when coupling or uncoupling cars. Inasmuch as the couplers of cars or engines cannot be uniform in style, size, or strength, and are liable to be broken and dangerous to those engaged in coupling them, all employés are enjoined before coupling cars or engines to examine and know the kind and condition of the drawhead, drawbar, and bumper link and coupling apparatus, and are prohibited from placing in the train any car with a defective coupling until they have first reported its defective condition to and received instructions from the yardmaster or conductor. Sufficient time is allowed and may be taken by employés in all cases to make the examinations required."

Rule 630:

"All employés are required to exercise caution to avoid injury to themselves or to their fellow-employés, and especially in switching or other movements of cars and trains. They are required to inform themselves respecting the location of all structures and obstructions along the line that will not clear them when on top or sides of

cars. * * * Attention is also called to the necessity of equal care in working about switches and stations and in yards to avoid injury by having feet caught in frogs, switches, and guard rails; jumping on or off trains or engines in motion for any purpose and all similar acts are dangerous. All employés are warned that, if they commit them, it will be at their peril and risk."

In the light of the testimony of the witness Shortridge, above quoted, and of all the circumstances surrounding the occasion, there is much force in the claim of the defendant that the plaintiff's decedent was guilty of contributory negligence in entering between the cars after he saw the engine applied to them, as he was approaching the cars. However, it may be doubted whether this was not a question of fact for the jury under proper instructions.

We prefer to place our decision upon the ground that the defendant's failure to have the hose cut by carmen was not the proximate cause of the injury; and, where the facts are not in dispute upon that question, it is for the court to find as matter of law whether or not the negligence complained of was the proximate cause. This is so elementary that it is hardly necessary to cite authorities in support of the rule. Conceding for the moment that the defendant was negligent, if the negligence of the defendant merely created the occasion, or gave rise to the condition on which other independent acts operated to cause the injury, the defendant cannot be held. In this case the negligence complained of is, in substance, that the hose and chains on these cars were left coupled, instead of being uncoupled. The alleged negligence of the defendant was the neglect to have them uncoupled by carmen. Assuming for the moment that such duty was imposed by the schedule, the fact that defendant had neglected its alleged duty in that regard was well known to Baker, both prior to and at the time of the injury. This negligence had created a condition, namely, cars coupled together with hose and chains. As we have be-

fore said, the cars were as harmless when coupled as they were when uncoupled. There was nothing in this condition to cause the injury, and nothing in it that did cause the injury. This was nothing more than the condition or situation in which the couplings were left. Baker selected a time to do this work when he should have known that it was dangerous, because he knew the engine, under the direction of Shortridge, his fellow switchman, was engaged in attempting to couple onto the cars. He must have known that more than one attempt to couple was a common occurrence, and might be necessary. He must have known, or should have known, that, if from any cause these cars were moved or shoved together while he was between them, he was likely to be killed or injured. The cars were moved while he was between them. Even if we are to say they were moved negligently, the negligence was that of a fellow-servant, for which defendant is not legally liable. It was this movement of the cars while Baker was between them that was the proximate cause of his injury. *Lewis* v. *Railway Co.*, 54 Mich. 55 (19 N. W. 744, 52 Am. Rep. 790). The reasoning of Chief Justice COOLEY in this case fully covers the question of proximate cause applicable to the instant case. *Vandercook* v. *Railroad Co.*, 125 Mich. 459 (84 N. W. 616); *McLane, Swift & Co.* v. *Elevator Co.*, 136 Mich. 664 (99 N. W. 875, 112 Am. St. Rep. 384); *Stark* v. *Lighting Co.*, 141 Mich. 575 (104 N. W. 1100, 1 L. R. A. [N. S.] 822); *Burrman* v. *Railway*, 143 Mich. 689 (107 N. W. 709); *Wickham* v. *Railway* 160 Mich. 277 (125 N. W. 22, 136 Am. St. Rep. 436); 1 White on Personal Injuries on Railroads, § 36 *et seq.;* 1 Cooley on Torts (3d Ed.), p. 99 *et seq.* That all the members of this switching crew were fellow-servants of plaintiff's decedent appears very plainly in the record. They were all engaged in the common service of switching cars. On the particular occasion in question they were engaged in moving three cars from one part of the yard to another part of the yard, and in doing the various duties incident to the accomplishment of that

work. If by negligence fellow-servants cause injury to each other, the employer is not liable. *La Pierre* v. *Railway Co.,* 99 Mich. 212 (58 N. W. 60); *Stanley* v. *Railway Co.,* 101 Mich. 202 (59 N. W. 393); *Greenwald* v. *Railroad Co.,* 49 Mich. 197 (13 N. W. 513); *Whalen* v. *Railroad Co.,* 114 Mich. 512 (72 N. W. 323); *Conger* v. *Railroad Co.,* 86 Mich. 76 (48 N. W. 695); *Burrman* v. *Railway, supra; Pease* v. *Railway Co.,* 61 Wis. 163 (20 N. W. 908). Inasmuch as the acts of these fellow-servants were conclusively shown to have been the proximate cause of Baker's death, the court should have directed a verdict for defendant. This view of the case impels us to reverse the judgment of the court below; and, because the law and facts conclusively show that the negligence alleged was not the proximate cause of the death of plaintiff's decedent, no new trial should be granted.

STEERE, BROOKE, and OSTRANDER, JJ., concurred with STONE, J.